IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DENISE KITCHEN, Individually | § | |
| And as Representative of the Estate of | § | |
| Gregory Maurice Kitchen, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | 3:10-CV-1779-P |
| | § | |
| DALLAS COUNTY, TEXAS, et. al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Now before the Court is Defendants' Motion for Summary Judgment, filed on December 31, 2012. (Doc. 49.) Plaintiff filed a Response on February 20, 2013. (Doc. 57.) Defendants filed a Reply on March 20, 2013. (Doc. 64.) After reviewing the parties' briefing, the evidence, and the applicable law, the Court GRANTS Defendants' Motion for Summary Judgment.

### I.      Background

This case arises from the unfortunate death of Gregory Maurice Kitchen ("Kitchen") during his pretrial detention at the Dallas County Jail facility. Kitchen was a pretrial detainee at the Dallas County Jail while he awaited trial. (Doc. 51-5 at 14.) During his stay, Kitchen began exhibiting troubling manifestations of mental malady, including bothering other inmates, digging through the property of others, and a giving a general impression of "decreased mental capacity." (Doc. 51-3 at 8.)

Although Kitchen was initially stationed in the West Tower, he was subsequently transferred to the North Tower. (Doc. 51-5 at 13.) During his incarceration and before his death, Kitchen received continual medical attention, including psychological evaluations, prescription

medication, and doctor visits. (Docs. 51-3 at 5, 7, 8, 9, 24; 51-2 at 20-23.) Notwithstanding his treatment, Kitchen's condition deteriorated, and prison officials noticed that he had vomited on his uniform, was pacing around his cell, and was hitting his head on the walls and door of his cell. (Doc. 51-5 at 3.) This behavior led to additional medical treatment. (*Id.*; Doc 51-3 at 11.) Kitchen himself admitted to having suicidal thoughts. (Doc. 51-3 at 1, 19.) In response to Kitchen's behavior, prison officials created a suicide prevention observation log. (Doc. 51-5 at 25.) In further response to his admissions of suicidal thoughts and his behavior, Kitchen was dressed in a paper gown known as a suicide smock, which is designed in such a way as to reduce inmates' ability harm themselves. (Doc. 58-9 at 37.)

The conduct giving rise to the instant suit began while prison officers were attending to an inmate in the cell adjacent to Kitchen's. Prison officials noticed that Kitchen was repeatedly banging his head on his cell door while yelling. (Doc. 51-4 at 13, 25, 29.) Responding officers ordered Kitchen first to sit on his bunk and subsequently to lie face-down on the ground, but Kitchen did not obey, instead choosing to display his middle finger, urinating on the cell door, and continuing to bang his head. (*Id.* at 6, 16.) Upon observing Kitchen's behavior, officers ordered that he be extracted from his cell to prevent him from hurting himself. (*Id.* at 6.) Kitchen was to be placed in a nearby restraint chair so that medical personnel could further evaluate him safely. (*Id.* at 6, 13, 17, 25, 35.) When officers entered Kitchen's cell, he did not follow orders, but instead became combative and began physically resisting efforts to place him in the chair. (*Id.* at 16, 29, 35.)

In order to subdue Kitchen, officers first used a takedown with a grasp on the neck. (*Id.* at 13, 25; Doc. 51-5 at 2.) Despite being taken down to the ground, Kitchen continued to physically resist any efforts to restrain him in handcuffs, utilizing leg-kicks. (Doc. 51-4 at 13,

19, 25, 29.) While on the floor and continuing to grapple with prison officials, Kitchen received a "one second burst of [oleoresin capsicum] spray" to the face. (*Id.* at 13, 16, 25, 35.) After being sprayed and while being moved into the hallway, Kitchen continued to resist the officers, managing to grab one by the hand, to grab one by the shirt, and to kick at another during the continuing struggle. (*Id.* at 13, 15, 16, 19, 25, 29, 35.) At this point in the struggle, which had now spilled out into the hallway, officers sprayed Kitchen with oleoresin capsicum a second time. (*Id.* at 13, 15, 16, 17, 19, 25.) Following the second spray, officers were able to place Kitchen in handcuffs and leg irons. (*Id.* at 13, 25, 29.)

Immediately after Kitchen was restrained, officers noted indicia of Kitchen's deteriorating physical condition. At this point, Kitchen became non-responsive and was breathing heavily. (Doc. 51-3 at 2.) Kitchen's pulse was faint. (*Id.*) Prison staff performed CPR until EMS arrived and took Kitchen to a hospital. (*Id.*) Dr. Kimberly King pronounced Kitchen dead shortly thereafter. (Doc. 51-2 at 1.) The medical examiner found that Kitchen died of "complications of physical restraint" including mechanical asphyxia, physiologic stress, and oleoresin capsicum exposure, with morbid obesity and cardiomegaly contributing to the cause of death. (Doc. 51-4 at 4.)

## II.     Legal Standard & Analysis

### A. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an

absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Celotex*, 477 U.S. at 323. However, all evidence and reasonable inferences to be drawn there from must be viewed in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party defending against the motion for summary judgment cannot defeat the motion, unless he provides specific facts demonstrating a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *See id.* at 249-50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Further, a court has no duty to search the record for evidence of genuine issues. Fed. R. Civ. P. 56(c)(1) & (3); *see Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). It is the role of the fact finder, however, to weigh conflicting evidence and make credibility determinations. *Liberty Lobby*, 477 U.S. at 255.

### B. Excessive Force

Defendants move for summary judgment as to any excessive force claim, arguing that the summary judgment evidence does not establish an underlying constitutional violation for

excessive force. (Doc. 50 at 6-7.) Plaintiff opposes summary judgment by insisting that a reasonable jury could find such a violation based on Defendants' infliction of unnecessary and wanton pain. (Doc. 59 at 11.)

A claim of excessive force is correctly examined under the same standard regardless whether the claim arises under the Eighth Amendment or the Fourteenth Amendment. *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993). In *Valencia*, the Fifth Circuit applied the standard developed by the Supreme Court in the context of Eighth Amendment claims involving the use of excessive force against convicted prisoners to the context of a pretrial detainee's claim arising under the Due Process Clause. *Id.* at 1445–47 (applying *Whitley v. Albers*, 475 U.S. 312 (1986) and *Hudson v. McMillian*, 503 U.S. 1 (1992)). Excessive force claims are analyzed to determine "whether the measure taken inflicted unnecessary and wanton pain and suffering." *Id.* at 1446. "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In order to determine whether a prisoner has been subjected to a constitutional violation, courts must consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. The inquiry has two components: (1) an objective one that focuses on whether the alleged wrongdoing was nontrivial and harmful enough to violate the constitution and (2) a subjective one that focuses on the mental state of the alleged wrongdoer. *Id.* at 7–8. Courts must examine the nature of the force used, not the extent of the injury sustained. *Wilkins v. Gaddy*, 559 U.S 34, 130 S.Ct. 1175, 1179 & n. 2 (2010).

Relevant objective factors which courts consider include (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) efforts made to temper the severity of the forceful response. *Hudson*, 962 F.2d at 523. "The Constitution does not authorize the Court to second-guess-with all the benefits of hindsight" the decisions of jail officials during the events in question. *Smith v. Zuniga*, No. SA–03–CA–0881 NN, 2006 WL 1207685, at *5 (W.D. Tex. May 4, 2006).

"[Prison officials] are entitled to wide-ranging deference." *Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998) (finding that the use of mace to quell a disturbance caused by inmates on a bus did not constitute excessive force). The use of force does not constitute cruel and unusual punishment when reasonably necessary to subdue a recalcitrant prisoner. *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975); *see also Williams v. Hoyt*, 556 F.2d 1336, 1339–40 (5th Cir. 1977) (affirming jury verdict for the defendants where evidence was sufficient to show that mace was used only for the control of unruly prisoners and was, therefore, not excessive).

Upon review of the summary judgment evidence, the first *Hudson* factor weighs in favor of the Plaintiff. A medical examiner determined that Mr. Kitchen died "as a result of complications of physical restraint including mechanical asphyxia, physiologic stress, and oleoresin capsicum exposure." (Doc. 51-4 at 4.) The examiner also noted that morbid obesity and cardiomegaly were also responsible in Kitchen's death. (*Id.*) As such, the undisputed evidence demonstrates that the injury sustained by Kitchen was indeed severe, ultimately resulting in death. While Kitchen indeed suffered very serious harm, the remaining *Hudson* factors all weigh in favor of Defendants.

The second *Hudson* factor weighs in favor of Defendants.  As an initial matter, the Court notes that the use of force was brought about largely by the intention of Sergeant G. Myers, DSO/SRT. Guzman, DSO/SRT Haggerty, and DSO/SRT Benson to keep Kitchen from harming himself after he refused to follow officers' instructions to stop banging his head on the door and to sit down on his bunk.  (Doc. 51-4 at 6, 13, 25.)  The record contains evidence suggesting that an inmate who bangs his head poses a very significant risk of serious injury, possibly even death. (Doc. 52 at 25.)  Other evidence demonstrates that there were plenty of warning signs suggesting that Kitchen was in danger of harming himself and also other prison officials.  Kitchen was dressed in a suicide smock.  (Doc. 58-9 at 37.)  In the immediate build up to the parties' struggle, prison officials noticed that Mr. Kitchen had begun repeatedly banging his head against the door of his cell.  (Doc. 51-4 at 13.)  Despite orders to stop banging his head on the door, Kitchen persisted banging his head, displayed his middle finger to officers, and began urinating on his cell door.  (*Id.* at 6, 16.)  Furthermore, Dr. Ahmed testified that a response to an inmate engaging in banging his head  must be much more brisk, must be immediate, and must result in securing the inmate.  (Doc. 52 at 25.)  Once additional prison officials arrived, the team resolved to place Kitchen in a restraint chair for his own protection.  (Doc. 51-4. at 6, 13, 17, 25, 35.)  Logic and common-sense suggest that placing Kitchen in the chair would require physical force even if Kitchen did not strenuously resist.  (*Id.* at 16, 17, 29.)

Furthermore, the need for application of force increased as Kitchen grew combative and resisted the officers.  (*Id.* at 16, 29, 35.)  Kitchen's attack was unexpected, and the officers' response was spontaneous, leaving them little time to temper their response.  (*Id.*)  Kitchen continued to resist even once he was removed from the cell, kicking and struggling despite orders of the officers.  (*Id.* at 13, 31, 35.)  Officers were faced with a disruptive and resisting

prisoner and faced an active, ongoing physical struggle on the ground involving prison officials and a three hundred fifty pound detainee who was clearly strong and resisting. (Doc. 51-5 at 19.) The need for an application of force was both clear and present. *Hudson,* 503 U.S. at 8. Although evidence suggests that officers utilized the powerful force of oleoresin capsicum, it is reasonable to conclude that Mr. Kitchen's persistent resistance necessitated the use of the spray until he was subdued. Ordinarily, "[p]epper spray is an effective method to gain a person's compliance without causing any adverse, long-term physical harm." *Roe v. Graham,* No. 2:09–CV–98–DPM, 2010 WL 4916328, at * 9 (E.D. Ark. Nov. 23, 2010).

The Third *Hudson* factor weighs in favor of Defendants. Prison officials do not violate the Constitution when they utilize "reasonable and necessary force" to subdue combative prisoners. *Deloach v. Howell,* 12 F.3d 1098 (5th Cir. 1993) (affirming magistrate's finding that prison officers used reasonable and necessary force to subdue belligerent prisoner). Examining the situation in its entirety, the evidence suggests that the need for force was indeed very great. As noted above, Kitchen began physically resisting the officers and struggled with them almost immediately after their entry into his cell. (Doc. 51-4 at 16, 29, 35.) Furthermore, even once Kitchen was taken down to the ground he continued to struggle and kick the team of officers in his cell. (*Id.* at 13, 19, 25, 29.) Even after a brief spray of oleoresin capsicum, Kitchen persisted in his efforts to physically resist all direction and instructions from prison officials. (*Id.* at 13, 15, 16, 19, 25, 29, 35.) In fact, the evidence demonstrates that it was only when placed in handcuffs and leg irons did Kitchen cease in his physical resistance. (*Id.* at 6, 13, 19, 25.) Although the Court notes that there were many officials who apparently were required to exert a significant amount of physical force, including the use of oleoresin capsicum more than once, this use of serious force is not so disproportionate to its obvious need in a stressful and

potentially dangerous situation for the officers tasked with monitoring Kitchen, who was himself in great mental and emotional distress at this time.  While it is unfortunate that the situation escalated to the point that force was used, the relationship between the force deployed and the need for the same was not disproportionate, especially when noting that "[prison officials] are entitled to wide-ranging deference" given their operation under dangerous and unpredictable circumstances.  *Baldwin*, 137 F.3d at 840 (finding that the use of mace to quell a disturbance caused by inmates on a bus did not constitute excessive force).

The Fourth *Hudson* factor also favors Defendants.  Plaintiff's disobedience in and of itself created a threat to prison officials, which required further intervention.  *See, e.g., Minix v. Blevins*, No. 6:06cv306, 2007 WL 1217883, 25 (E.D. Tex. Apr. 23, 2007) (disobeying of orders itself poses a threat to the order and security of the prison as an institution); *Soto v. Dickey*, 744 F.2d 1260, 1270–71 (7th Cir. 1984) (same).  The evidence demonstrates two very serious threats which the officers reasonably perceived.  First, there was a very real threat that Mr. Kitchen posed to himself, namely the threat of inflicting serious bodily harm.  Even a glance at Mr. Kitchen's smock would have revealed that he was on suicide watch.  (Doc. 58-9 at 37.)  This fact, combined with Kitchen's repeated banging of his head on his cell door, even after being instructed to stop and sit on his bunk, would have unambiguously demonstrated that Kitchen intended to harm himself.  (Doc. 51-4 at 6, 16.)  Dr. Ahmed offers undisputed evidence that an inmate who bangs his head poses a very significant risk of serious injury, possibly even death.  (Doc. 52 at 25.)  Second, Mr. Kitchen's physical resistance posed a very real threat to the officers charged with placing him in the restraint seat.  For example, officers who entered Kitchen's cell immediately met resistance, including when Mr. Kitchen grabbed one officer, and began kicking and swinging at others in his cell.  (Doc. 51-4. at 13, 29, 25, 29.)  Even after being

sprayed with oleoresin capsicum, Kitchen grabbed and kicked at officers.  (*Id.* at 13, 15, 16, 19, 25, 29, 35.)  Kitchen was quickly moved into the hallway where he continued to resist, kick, and even pulled another officer towards his body.  (*Id.*)  In light of the evidence, it is difficult to imagine a reasonable prison official who would have perceived this situation as routine, safe, or placid.  Examination of the summary judgment evidence on the fourth *Hudson* factor supports a determination that a reasonable officer would have perceived a threat and would have felt the use of force was necessary to re-establish security and control, especially in a tumultuous situation such as this.

The final *Hudson* factor also weighs in favor of Defendants.  The evidentiary record does not suggest that the responding officers immediately resorted to the most extreme of physical force.  Although physical restraint ultimately led to Kitchen's death, it was not immediately deployed.  Officers first began with ordinary efforts to place kitchen in the restraint chair.  It was only when Kitchen began to struggle did the force escalate.  Even after being taken down with a controlled neck takedown, Kitchen would not relent.  (*Id.* at 13, 19, 25, 29.)  Evidence indicates that the neck grip was released even when Kitchen was still combative.  (*Id.* at 3.)  Kitchen's continued resistance necessitated an increased amount of force, resulting in a "one second burst" spray of oleoresin capsicum.  (*Id.* at 13, 16, 25, 35.)  After the spray, officers did not immediately spray again or use punches or kicks, but resorted back to attempting to subdue Kitchen via holds and locks.  (*Id.* at 13, 15, 16, 19, 25, 29, 35.)  Only when these efforts failed, and once the conflict persisted further did the officers resort to a second burst of spray, which then allowed officers to place Kitchen in handcuffs and leg irons.  (*Id.* at 13, 15, 16, 17, 19, 25.)  The medical examiner reports corroborate officers' statements that only two bursts of oleoresin capsicum were deployed on Kitchen.  (*Id.* at 3.)  Given the context of Kitchen's persistent unruly

behavior that included extreme physical resistance, paired with officers' efforts to temper the force's severity, the final *Hudson* factor favors Defendants. *Baldwin*, 137 F.3d at 840 ("[t]he amount of force that is constitutionally permissible ... must be judged by the context in which that force is deployed"); *see also Grayson v. Peed*, 195 F.3d 692, 696–97 (4th Cir. 1999) (officers did not use excessive force against detainee, in violation of due process, even though they used pepper spray to subdue him and five-man cell extraction teams to move him).

In opposing the instant Motion, Plaintiff relies primarily on two pieces of evidence which suggest that officers "kicked and stomped on" Kitchen and that the guards sprayed him even after he was fully restrained. (Doc. 59 at 13.) The evidence supporting this claim is based in two affidavits from prisoners. One affidavit states that that (1) "they pull [Kitchen] out and spray him 3 or more times and kicked him stubbing [sic] on him putting [sic] their feet on his legs and hands then he stop moving then they carry him down the hall." (Doc. 58-8 at 83.) The other cited affidavit states that "they pulled out [Kitchen's] cell kicked him in facial [sic] quite [sic] resisting more kicking...then spray 2x more in face. Then pulled him around corner." (*Id.* at 84.) Noting that it is not the province of the Court to make a credibility determination at the summary judgment stage, the evidence submitted by Plaintiff is insufficient to create a fact issue as to an excessive force claim. *See Hoyt*, 556 F.2d at 1339–40 (affirming jury verdict for the defendants where evidence was sufficient to show that mace was used for the control of unruly prisoners and was, therefore, not excessive); *see also Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (citing cases); *Spain v. Procunier*, 600 F.2d 189, 195-96 (9th Cir. 1979) (citing cases) ("[U]se of nondangerous quantities [of mace] in order to prevent a perceived future danger does not violate 'evolving standards of decency' or constitute an 'unnecessary and wanton infliction of pain'").

Even accepting Plaintiff's proffered evidence as one-hundred percent accurate, it does not overcome the detailed evidence which suggests that there was a need to enter the cell and protect Kitchen from harming himself, or the unrebutted evidence that Kitchen had previously engaged in this conduct in the West Tower. *Clemmons*, 509 F.2d at 1340 (use of force does not violate the Constitution where reasonably necessary to subdue a recalcitrant prisoner).   Nor does Plaintiff's proffered evidence suggest that there was never any physical resistance between Kitchen and the officers.  Additionally, even accepting as true the fact that officers continued to use force even after Kitchen was placed in handcuffs, courts have long recognized that simply handcuffing a suspect does not instantly and completely eliminate all risks that the suspect will flee or do others harm.  *United States v. Sanders,* 994 F.2d 200, 209 (5th Cir. 1993); *see also Jones v. Shields*, 207 F.3d 491, 495–96 (8th Cir. 2000) (correctional officer's use of a pepper-based chemical spray was not "repugnant to the conscience of mankind" when used to subdue a "recalcitrant prisoner" locked in his cell or in handcuffs).   Viewing the totality of the circumstances, the proffered evidence does not create a fact issue as to whether the officers' conduct rose to the level of sadism or malice required for excessive force purposes, especially when viewed with the due deference afforded to officers who are forced to make quick judgments in dangerous places with mentally unstable wards.  *See Graham*, 490 U.S. at 396–97 (noting that courts do not utilize "the 20/20 vision of hindsight," and consider "the fact that…officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"); *see also Williams v. Scott,* No. 96–2184, 1997 WL 312273, at *1 (7th Cir. 1997) (affirming summary judgment in favor of prison guard who administered a two-second burst of

mace after an inmate refused to stop kicking his cell door; inmate admitted the guard used mace only to restore discipline after the inmate refused a direct order).

Plaintiff's ultimate contention is that "a reasonable jury could conclude that this unplanned cell extraction was motivated by…a desire to retaliate against Kitchen for using the impolite gesture [of displaying his middle finger]." (Doc. 59 at 13-14.) This assertion does not comport with the undisputed evidence that Kitchen was repeatedly hitting his head on his cell door, urinating on the cell door, refusing to follow the orders of prison staff, and thoroughly resisting any and all efforts to subdue him. Plaintiff's assertion is not reasonable, nor could a reasonable jury find that retaliation was a motivation for entering the cell, given the litany of dangers which existed at the time and could have caused harm to either Kitchen or the officers. Any actions which result in a detainee's death are both sad and unfortunate. Nevertheless, based on the record, the Court finds that the defendant officers acted in good faith to restore order, and did not use excessive force.

### C. Deliberate Indifference

According to Defendants, "there is simply no evidence that anyone at the Jail knew that Kitchen was suffering from a mental health condition and then acted with deliberate indifference to that condition." (Doc. 50 at 17.) Defendants have thus moved for summary judgment as to the claim of denial of medical care under the Fourteenth Amendment. (*Id.*) Plaintiff opposes summary judgment by insisting that a reasonable jury could conclude that Defendants were deliberately indifferent to Kitchen's serious medical needs. (Doc. 59 at 15.)

A prison official violates an inmate's constitutional rights when he acts with deliberate indifference to the inmate's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (plaintiff must show that the jail or

prison officials refused to treat the inmate, ignored his complaints, intentionally treated the inmate incorrectly, or acted in any similar way which would show a wanton disregard for any serious medical needs); *see also Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (plaintiff must show officials acted in way that clearly evidences "a wanton disregard for any serious medical needs"). This requires proof that jail officials were subjectively aware of a substantial risk of serious harm and failed to take reasonable measures to abate this risk. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The standard of deliberate indifference allows courts to distinguish omissions which are an intentional choice from those which are simply unintentional oversights. *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (internal citations omitted). The Fifth Circuit has defined a serious medical need as one which is "so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n. 12 (5th Cir. 2006).

It is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim. *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993). As long as jail medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *See Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982).

By way of the Response, Plaintiff argues that "a reasonable jury could find that [jail personnel's] failure to follow jail policies and to seek medical assistance in performing the extraction…amounted to a deliberate indifference to Kitchen's serious medical needs."[1] (Doc. 59 at 16.) Plaintiff characterizes the two core incidents in this case as (1) Kitchen's transfer from

---

[1] Plaintiff's response cites only *Estelle*, in support of its deliberate indifference argument. (Doc. 59 at 15-16.) Although *Estelle* is properly cited as requiring conduct amounting to "deliberate indifference," it is not particularly helpful to Plaintiff's case, as the court in *Estelle* found that the plaintiff failed to state a claim when he alleged facts that "at most" amounted to "medical malpractice." *Estelle*, 429 U.S. at 107.

the West Tower to the North Tower for punitive reasons which resulted in his location in a less secure environment with inadequate medical treatment, and (2) a "non-emergent cell extraction" which amounted to deliberate indifference. (*Id.* at 15, 19.)

As to the first ground, Plaintiff alleges that "the evidence adduced at discovery shows that Captain Rowe banished Kitchen from the West Tower, which was equipped to address Kitchen's medical needs, and instead transferred him into administrative custody in the North Tower." (*Id.* at 19.)   Plaintiff further claims that this transfer was motivated by a desire to retaliate against Kitchen for a physical altercation between Kitchen and nurse staff located in the West Tower. (*Id.*)

Upon review of the record, Plaintiff's argument as to the transfer from the West Tower to the North Tower does not withstand a motion for summary judgment.  First, Defendants have submitted unrebutted evidence indicating that it was Dr. Waseem Ahmed and his psychiatric treatment team who decided to move Kitchen, not Captain Rowe.[2]  (Doc. 52 at 18-19.)  The group that made this decision include Todd Ridge—a nurse practitioner, Jason Varghese—a psychologist, and Dr. Ahmed.  (*Id.*)  Furthermore, the unrebutted evidence suggests that this team made the decision to move Kitchen from the West Tower to the North Tower because "it is much more secure than the previous housing." (*Id.* at 19.)  Specifically, Dr. Ahmed noted that the particular cell where Kitchen was to be transferred was very close to Ahmed's office, that the area is "highly protected," that it affords "close monitoring" for detainees, and that the North

---

[2] Plaintiff attempts to create a fact issue on this point by citing the deposition testimony of Captain Rowe and suggesting that Rowe possessed sole authority as to Kitchen's location. (Doc. 58-2 at 13.) Rowe's testimony merely indicates that Rowe was unsure who made the recommendation to move Kitchen. (*Id.*) However, Dr. Ahmed's testimony conclusively demonstrates that Ahmed, Ridge, and Varghese made the decision to move Kitchen in this case and had the authority to do so. (Doc. 52 at 18-19.) Rowe's own testimony indicates that the decision to move Kitchen occurred after Rowe reported Kitchen's behavior to Dr. Ahmed and his staff. (Doc. 58-2 at 11.) Plaintiff has failed to cite any evidence rebutting this testimony.

Tower cells were less likely to succumb to efforts to break the glass which could then be used as a dangerous weapon. (*Id.*)  Dr. Ahmed also noted that North Tower cells have showers in the cell itself, thereby reducing the need for potentially dangerous exit from the cell. (*Id.*)  As to the availability of medical care in North Tower, Dr. Ahmed testified that North Tower has more staff—including a special response team—than did the West Tower. (*Id.* at 20.)  This meant that if there was a detainee exhibiting dangerous behavior, officers with special training would be nearby to respond. (*Id.* at 20-21.)  Finally, Dr. Ahmed noted that his office was in very close proximity to Kitchen's cell in North Tower, and he was therefore available in case a special situation arose. (*Id.* at 19) ("The environment of the North Tower at that particular cell is very close to my office").

Based on this evidence, no reasonable jury could find that the decision to transfer Kitchen from the West Tower to the North Tower was motivated by anything other than Kitchen's own safety. The undisputed evidence demonstrates that Dr. Ahmed and his team made the decision to transfer Kitchen out of concern for his safety and the safety of the jail staff. Furthermore, no genuine issue of material fact exists as to the availability of care in North Tower. To the contrary, the evidence reveals that North Tower was uniquely configured to assure Kitchen safety, supervision, and access to medical care. In the North Tower where Kitchen was housed, the same level of crisis response teams and professional were available as in the West Tower. (*Id.* at 28.)  Dr. Ahmed's office was less than thirty seconds away from the cell where Kitchen was housed in the North Tower. (*Id.* at 29.)  Finally, the evidence suggests that there would not have been any problems associated with housing Kitchen in the North Tower. (*Id.* at 30.)

As to the second ground, Plaintiff claims that core policies comprise the foundation upon which a jury could draw an inference of deliberate indifference. First, Plaintiff claims that

Dallas County trains a specialized subclass of prison officials known as "Mental Health Transfer Officers" who are charged with extracting detainees so as to minimize their risk of harm. (*Id.* at 16.) Second, Plaintiff claims that "official policy mandates that guards seek medical assistance before extracting a mentally-ill detainee." (*Id.*)

In support of the second policy, Plaintiff has cited the deposition of Captain Don Rowe, who answered in the affirmative to a question asking whether "the policy at Dallas County jail is to seek the assistance, advice or care of either medical or mental health staff prior to doing an extraction of the inmate from his cell." (Doc. 58-2 at 18.) When examined in full however, Rowe's testimony does not support the contention that this policy was absolute. To the contrary, Rowe testified that he would not consider it a violation of Dallas County custom and policy to extract a detainee from his cell "without the officers who extracted him seeking medical attention prior to that extraction" because "there is too many variables. It just depends on what is happening at the time...is there human life in danger." (*Id.*) Rowe went on to further state that notable exceptions to the general rule include where "there is a life at risk, or if an officer is in danger, if there is fear an inmate is going to hurt themselves before we can get the medical staff there..." (*Id.*) Other evidence in the record shows that the response to an inmate engaging in banging his head must be much more brisk, must be immediate, and must result in securing the inmate. (Doc. 52 at 25.)

In light of Plaintiff's proffered summary judgment evidence, there is no genuine issue of material fact as to whether the prison officials acted with deliberate indifference to Kitchen's medical needs when they extracted him from his cell. As an initial matter, the evidence suggests that during his incarceration, Kitchen received a substantial amount of medical treatment. (Docs. 51-3 at 5, 7, 8, 9, 24; 51-2 at 20-23.) "Medical records of sick calls, examinations, diagnoses,

and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993)).

Additionally, as noted in Section IIB above, the officers tasked with supervising Kitchen observed that he posed a danger of hurting himself when he repeatedly hit his head on his cell door despite being ordered to stop. Dr. Ahmed testified that an inmate who bangs his head poses a very significant risk of serious injury, possibly even death. (Doc. 52 at 25.) The danger which Kitchen posed to himself would have been more obvious to officers given his suicide-prevention smock and the medical records. Furthermore, once officers entered the cell they found themselves in danger when Kitchen began physically resisting them. The need to fully remove Kitchen grew even more apparent after a brief spray of oleoresin capsicum, when Kitchen continued to resist efforts to subdue him and the small cell quickly filled with the spray. Given the tumultuous circumstances under which the prison officials were forced to act, both in the name of protecting Kitchen and themselves, no reasonable jury could find that they acted with deliberate indifference to Kitchen's serious medical needs by failing to wait for a Mental Health Transfer Officer before extracting him.

Finally, once Kitchen became unresponsive, the evidence suggests that a medical doctor was immediately summoned. (Doc. 51-4 at 5, 6, 8.) Nurses quickly arrived on the scene and began attending to Kitchen. (*Id.* at 34, 35.) Also, an ambulance was dispatched and Kitchen was sent to a nearby hospital shortly thereafter. (Doc. 51-1 at 16.) In light of all the evidence submitted, Plaintiff has failed to demonstrate a genuine issue of material fact that prison officials "refused to treat [Kitchen], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious

medical needs." *Domino* 239 F.3d at 756 (quoting *Johnson v. Treen,* 759 F.2d, 1236, 1238 (5th Cir. 1985)).    Accordingly, the Court grants summary judgment as to Plaintiff's inadequate medical care claim.[3]

### III.    Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Signed this 23rd day of April, 2013.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

---

[3] Finding no underlying constitutional violation under either an excessive force theory or an inadequate medical care theory, any analysis of qualified immunity or municipal liability is unnecessary at this time.